IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIKA R. QUINN,                    )
                                   )
        Plaintiff,                 )
                                   )
        vs.                        )        Civil Action No. 10-1415
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
        Defendant.                 )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Pending before the Court are cross-motions for summary judgment
filed by Plaintiff Erika R. Quinn and Defendant Michael J. Astrue,
Commissioner of Social Security.   Plaintiff seeks review of a final
decision by the Commissioner denying her claim for disability
insurance benefits ("DIB") under Title II of the Social Security Act,
42 U.S.C. §§ 401 *et seq.*   For the reasons discussed below, Defendant's
motion is granted and Plaintiff's motion is denied.

### II.   BACKGROUND

#### A.    Factual Background

Plaintiff Erika (Stinelli) Quinn was born on August 13,
1978.   (Certified Copy of Transcript of Proceedings before the
Social Security Administration, Docket No. 6, "Tr.," at 27.)
Although she was diagnosed with depression and had some disciplinary
problems while in high school, she completed her degree in 1996.

(Tr. 135, 250.) She worked for about two years as a telemarketer, then became a retail service representative for a window installation company in 2001 and continued in that job through March 2007. (Tr. 131.) During the last year or so that she was working, she missed work regularly due to depression, anxiety, and an inability to get along with other people. She eventually went on long-term disability from her company. (Tr. 250.)

On November 16, 2007, Ms. Quinn visited Arthritis and Internal Medicine Associates at the suggestion of her insurance company after she began experiencing increased pain in her knees, shoulders, hips, wrists and elbows, as well as headaches, twitching of her left hand and leg, and significant fatigue. The pain in her knees was a long-standing problem, but on physical examination, she also experienced pain at most of the "tender points" associated with fibromyalgia. [1]  (Tr. 282-283.) In a follow up appointment on February 2, 2009, Ms. Quinn's chief problem was pain in her shoulders,

_____

[1] Fibromyalgia is a common condition characterized by long-term, body-wide pain and tender points in joints, muscles, tendons, and other soft tissues. It has been linked to fatigue, morning stiffness, sleep problems, headaches, numbness in hands and feet, depression, and anxiety. The overwhelming characteristic of fibromyalgia is long-standing pain associated with 18 defined "tender points," which are distinct from "trigger points" seen in other pain syndromes. Diagnosis of fibromyalgia requires a history of at least three months of widespread pain, as well as pain and tenderness in at least 11 of the 18 tender-point sites. Laboratory and x-ray tests may be done to confirm the diagnosis, primarily by ruling other conditions with similar symptoms. See the medical encyclopedia entry for "fibromyalgia" at the National Institute of Medicine's on-line website, Medline Plus, www.nlm.nih.gov/medlineplus (last visited May 16, 2011) ("MedlinePlus.")

for which she received injections.[2]  (Tr. 275-281.)

At some point, Ms. Quinn had been diagnosed with bipolar disorder.[3]  She received treatment for a short time from Family Behavioral Resources in 2006, but failed to attend follow-up appointments and was discharged.  (Tr. 221.)  In December 2007, she voluntarily went to the emergency room of Westmoreland Regional Hospital in Greensburg, Pennsylvania, after she began having suicidal thoughts, panic attacks, anxiety, and a severe headache. (Tr. 134.)  Following a short evaluation, she was released in stable condition.  She again returned for treatment with Family Behavioral Services in March 2008, only to drop out again by July of that year.

---

[2]  Following the appointment on November 16, 2007, Ms. Quinn had been asked to forward x-ray records, undergo some blood tests, consult with a neurologist, and return in two months for another evaluation.  According to the notes from February 2009, none of these actions were taken.  Ms. Quinn did consult with an organization called "Pain Management" which confirmed the diagnosis of fibromyalgia; however, no notes from that medical provider appear in the record.  (Tr. 275-276.)

[3]  Bipolar disorder is a mental condition resulting from disturbances in the areas of the brain that regulate mood.  It is characterized by periods of excitability (mania) alternating with periods of depression.  During manic periods, a person with bipolar disorder may be overly impulsive and energetic, with an exaggerated sense of self.  The depressed phase brings overwhelming feelings of anxiety, low self-worth, and suicidal thoughts. The mood swings between mania and depression can be very abrupt, or manic and depressive symptoms may occur simultaneously or in quick succession in what is called a mixed state.  There is a high risk of suicide with bipolar disorder and it is often accompanied with alcohol or other substance abuse.  See medical encyclopedia entry at MedlinePlus.

3

## B. Procedural Background

On August 23, 2008,[4] Ms. Quinn filed an application for a period of disability and disability insurance benefits, alleging that she had become unable to work as of March 2, 2007, due to bipolar disorder, depression, agoraphobia, anxiety, and paranoia. (Tr. 110-112, 129.) The Social Security Administration denied her application on January 16, 2009, reasoning that although her mental limitations prevented her from returning to her previous work as a sales representative, there were other jobs she could perform. (Tr. 53, 59-62.)

Plaintiff then timely requested a hearing before an Administrative Law Judge ("ALJ""), which was held on December 2, 2009, before Judge Marty R. Pillion, in Johnstown, Pennsylvania. Ms. Quinn, who was represented by counsel, testified, as did an impartial vocational expert ("VE"), George Starosta. Judge Pillion issued his decision on December 9, 2009, again denying benefits. (Tr. 6-19.) On August 24, 2010, the Social Security Appeals Council advised Ms. Smith it had chosen not to review the ALJ's decision, finding no reason under its rules to do so. (Tr. 1-3.) Therefore, the December 9, 2009 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399

---

[4] Ms. Quinn had apparently completed an earlier application for disability beginning March 2, 2007, which was denied on May 9, 2008, after Plaintiff failed to attend examinations scheduled for April 4 and May 6, 2008. As result, disability could not be determined. (Tr. 52, 55-58.)

4

F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). On October 25, 2010, Plaintiff filed suit in this Court seeking judicial review of the ALJ's decision.

## C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test

5

if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).

## IV. ANALYSIS

### A. The ALJ's Determination

In determining whether a claimant is eligible to receive a period of disability and disability insurance benefits, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful

6

employment[5] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). A claimant seeking DIB must also show that she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which she was last insured. 42 U.S.C.§ 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Ms. Quinn satisfied the first two non-medical requirements, and the parties do not dispute the ALJ's finding that Plaintiff's date last insured will be March 31, 2013.

To determine a claimant's rights to DIB,[6] the ALJ conducts a formal five-step evaluation:

    (1)   if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

    (2)   if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits her ability to do basic work activity, she is not disabled;

    (3)   if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20

---

[5]  According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[6]  The same test is used to determine disability for purposes of receiving either DIB or supplemental security income benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

7

C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[7] to perform her past relevant work, she is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 404.1520; *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[8] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Pillion first concluded Ms. Quinn had not engaged in substantial gainful activity since March 2, 2007. (Tr. 11.) In resolving step two, the ALJ found that as of the date of the hearing, Plaintiff suffered from a number

---

[7] Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[8] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n.2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

8

of severe impairments: fibromyalgia, bipolar disorder, attention deficit hyperactivity disorder, generalized anxiety disorder, depression, personality disorder and a history of alcohol and drug abuse. (Tr. 11.)

At step three, the ALJ concluded none of Plaintiff's impairments, considered singly or in combination, satisfied the criteria of any relevant Listing. That is, when considering Plaintiff's depression and bipolar disorder against Listing 12.04 (affective disorders), her anxiety against Listing 12.06, and her history of alcohol and drug abuse against Listing 12.09, the ALJ found she had no more than moderate restrictions in activities of daily living, social functioning, and concentration, persistence or pace. He further found that although she had received emergency room treatment in December 2007 for anxiety and depressive symptoms, she was discharged after only about four hours. She had not been hospitalized for psychiatric problems or attended or been referred to any type of partial hospitalization program or other highly supportive living arrangement since her alleged onset date. (Tr. 12-14.)[9]

At step four, the ALJ concluded Plaintiff retained the residual functional capacity

_____

[9] The ALJ did not compare Plaintiff's fibromyalgia, attention deficit hyperactivity disorder, or personality disorder to any Listing or discuss these impairments in detail in his decision. However, Plaintiff does not raise any arguments with regard to these omissions and the Court declines to do so on her behalf.

to perform light work. . .except she is limited to occasional reaching in all directions, is limited to the performance of routine, repetitive work tasks on a sustained basis, can tolerate occasional interaction with supervisors and co-workers and no interaction with the general public, and can make simple, work-related decisions and tolerate infrequent changes in work setting.

(Tr. 14.)

The ALJ further concluded that due to her combination of exertional and non-exertional limitations, Plaintiff could not return to her past relevant work as a sales person and a retail sales representative, both of which the Vocational Expert had described as semi-skilled, light work. (Tr. 21, 39.) However, based on Plaintiff's age, [10] high school education, work experience, and residual functional capacity, the ALJ concluded other jobs existed in significant numbers in the economy which Plaintiff could perform despite her limitations. In reaching this conclusion, the ALJ relied on the testimony of the VE who identified the occupations of sorter, garment packer, and assembler, describing them as light, unskilled jobs. (Tr. 18, *see also* Tr. 48.) Thus, Ms. Quinn had not been under a disability between March 2, 2007, and the date of the ALJ's decision and, consequently, was not entitled to benefits. (Tr. 18-19.)

---

[10] Ms. Quinn was 28 years old as of her alleged disability onset date, making her a "younger individual age 18-49," according to Social Security Regulations. 20 C.F.R. § 404.1563.

## B. Plaintiff's Arguments

Ms. Quinn raises two arguments in her brief in support of the motion for summary judgment. ("Plf.'s Brief," Doc. No. 9.) First, the ALJ erred by not finding her to be fully credible, in part because he misstated or mischaracterized her testimony, and in part because he gave undue weight to the fact that she could independently perform many activities of daily living. (Id. at 5-9.) Second, the ALJ's dismissal of certain parts of a consulting examiner's report is a serious error of law meriting reversal. That is, the ALJ either ignored or misinterpreted the report of the consultant who found Ms. Quinn would have marked difficulties in certain work-like activities and had serious symptoms of mental impairment. (Id. at 9-11.) Plaintiff does not object to any of the ALJ's findings with regard to her physical limitations, therefore, we do not consider those impairments in the following discussion.

We begin with the second of Plaintiff's arguments inasmuch as issues of credibility depend in part on the ALJ's accuracy in reviewing and evaluating the medical evidence. *See* Snedeker v. Comm'r of Soc. Sec., No. 06-2878, 2007 U.S. App. LEXIS 16093, *9 (3d Cir. July 6, 2007) (complaints of disabling symptoms may be undermined by the absence of objective medical evidence to corroborate the claimant's statements.)

## C. Discussion of Plaintiff's Arguments

1. *The ALJ improperly weighed the consulting examiner's report:* In December 2008, at the request of the Pennsylvania Bureau of Disability Determination, Ms. Quinn underwent a consultative examination by psychologist Daniel C. Marston, Ph.D. (Tr. 248-256.) In the history provided by Ms. Quinn, she noted that her long-standing mental problems had been exacerbated in the last two years due to the death of her mother and a divorce from her first husband. Her diagnoses were bipolar disorder and generalized anxiety disorder; her symptoms were frequent shakiness, heart racing, anxiety, difficulties being around people, lack of energy, thought racing, and crying. Since being diagnosed with depression as a teenager, she had seen several different psychiatrists and therapists. At the time of the consultative exam, she was seeing a psychiatrist every one or two weeks and had just begun seeing a therapist. Her only medication at the time was Xanax,[11] 0.5 mg five times a day; a number of medications previously prescribed had not been effective. She also denied any present use of alcohol or illegal drugs despite having a long-term history of heavy alcohol consumption. (Tr. 249.)

Although Ms. Quinn reported she had gone to the hospital emergency room "several times" because of suicidal ideation and panic

---

[11] Xanax (alprazolam) is used to treat anxiety, panic disorder, depression, and agoraphobia. It is in a class of medications called benzodiazepines which work by decreasing abnormal excitement in the brain. *See* drugs and supplements entry at MedlinePlus.

12

attacks, she had never been admitted for such problems. The only medical report of such emergency room treatment was that of December 5, 2007, when she went to the Westmoreland Hospital with headache, a history of suicidal ideation, and depression. (Tr. 249-250.)

In Dr. Marston's mental status examination, he noted Ms. Quinn described her mood as "low" and reported she was "on edge" most of the time. She denied any present thoughts or plans of suicide or homicide or any past or present difficulties with hallucinations, delusions, or episodes of depersonalization. Her responses were relevant without tangential thinking or paucity of ideas. She did not exhibit evidence of flight of ideas, loose associations or neologisms. She demonstrated appropriate gait, bearing, posture, and attitude about being interviewed. Her affect was sad throughout the meeting, but she had appropriate eye contact and exhibited no noteworthy mannerisms, tics, or gestures. (Tr. 251.)

Dr. Marston described Ms. Quinn as having "basically intact" abstract thinking, with appropriate answers to questions he asked. Likewise, she exhibited basically intact math skills and the ability to answer questions designed to test her recall, such as short- and long-term events and recalling multi-digit number sequences. [12] Although she did not demonstrate any significant impulse control

[12] Dr. Marston described her recall as only "fair" although he also noted her recall seemed correct for events from days, week, months, and years ago "as best as [he] could tell without objective verification of the facts." (Tr. 252.)

13

problems during the interview, she reported she became angry quickly and had been in "some loud arguments in the past two months." She seemed to reflect some difficulty with social judgment as evidenced by her responses to hypothetical social situations, which Dr. Marston concluded was associated with her depressive mood. Ms. Quinn seemed to acknowledge problems with her mood and her need for mental health treatment to address those problems. (Tr. 251-252.)

Dr. Marston concluded Ms. Quinn was trying to give reliable and correct responses throughout the interview. He further concluded that her depressed mood would interfere with her ability to work and that she would have "even more significant difficulties functioning if the stressors in her life were to increase." (Tr. 253.) His diagnostic impression was depressive disorder, NOS, and his rating of her GAF[13] was 52 at the time, with the highest in the past year being 58. Although she had talked about problems with anxiety during the interview, Dr. Marston regarded her as having "significant problems related to depression." He concluded, "It is my impression that she has a fair prognosis for showing improvement in her overall

---

[13] The Global Assessment of Functioning or "GAF scale" assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n.2 (D. Del. Apr. 18, 2002); see also the on-line version of Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited May 13, 2011. The GAF scale and its use as a diagnostic tool are discussed in more detail below.

14

mood provided she continues to receive mental health treatment and follows recommendation[s] made by her psychiatrist and/or therapist consistently." (Tr. 253-254.)

Dr. Marston completed a checklist of work-related abilities, noting that due to her depression, she would have slight limitations in the ability to understand, remember, and carry out short simple instructions but "marked" limitations in those areas where the tasks involved more detailed instructions, and moderate limitations in the ability to make simple work-related decisions. He concluded she would have moderate difficulties with interacting appropriately with the public, supervisors and co-workers, but marked limitations in responding appropriately to work pressures and changes in a routine work setting, especially with regard to more complicated tasks, again due to her depression. (Tr. 255.) He did not believe any other capabilities were affected by her impairments. (Tr. 256.)

In Judge Pillion's summary of the medical evidence, he noted Dr. Marston's conclusions regarding the degree of limitation she would have in completing work-related tasks, which he summarized consistently with the Court's own descriptions in the previous paragraph; her "fair" prognosis for improvement, assuming she continued to receive mental health treatment; and her past drug and alcohol abuse, but no evidence of current limitations as a result of such use. (Tr. 16.) He also noted Dr. Marston's assessment of

15

Plaintiff's GAF at 52, indicative of "moderate" symptoms and/or "moderate" difficulties in social and occupational functioning.

Plaintiff contends under that well-established precedent in this Circuit, an ALJ may not make speculative inferences from medical reports, favor his own lay expertise over that of a physician who presents competent medical evidence, or rely on his own "amorphous impressions" of the record and his evaluation of the claimant's credibility. (Plf.'s Brief at 9, *citing* Horn v. Schweiker, 717 F.2d 871 (3d Cir. 1983), Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999), and Kent v. Schweiker, 710 F.2d 110, 115 (3d Cir. 1983).) Ms. Quinn argues that Judge Pillion selected only those parts of Dr. Marston's report which supported his own conclusion that she was able to perform at least some types of unskilled light work while ignoring those conclusions which showed she was unable to perform any substantial gainful activity. In particular, the ALJ ignored or rejected Dr. Marston's findings that she had "marked" limitations in her ability to respond appropriate to work pressures and changes in routine work settings; her prognosis was only "fair," and her GAF at the time of the examination was 52, indicative of serious mental impairments. According to Ms. Quinn, the ALJ incorrectly interpreted the GAF score of 52 as indicative of only "moderate" symptoms or "moderate difficulty with social and/or occupational functioning. This finding by the consulting psychologist is consistent with the GAF scores

16

reported by her psychiatrist at Family Behavioral Resources in March 2008 when the score was 54 and 52 in July and August 2008. (Id. at 10-11.)

We find none of these arguments persuasive. First, as can be seen from the Court's own description of Dr. Marston's findings, the ALJ considered and accurately evaluated his report. While we agree with Ms. Quinn that the ALJ may not substitute his own lay opinions for those of a medical practitioner and may not "pick and choose" from among the medical evidence only those facts which support his conclusions, Plaintiff fails to explain how Dr. Marston's findings reflect an opinion that she is unable to perform any substantial gainful activity. Contrary to Plaintiff's argument that the ALJ ignored or rejected Dr. Marston's findings with regard to her "marked" limitations and her "fair," prognosis, both these comments are specifically noted in his decision. In fact, Dr. Marston's conclusions that she would be limited (1) in her ability to understand and carry out more complex work-related instructions and (2) in her ability to interact with supervisors, co-workers, and the public are both reflected in the ALJ's residual functional capacity description which limits her to jobs requiring only "routine repetitive work tasks on a sustained basis," "simple, work-related decisions," "infrequent changes in work setting," and only "occasional interaction with supervisors and co-workers and no interaction with

17

the general public." (Tr. 14.)

We further conclude that Plaintiff's argument regarding her GAF scores reflects a serious misunderstanding of this diagnostic tool. As indicated in note 13 above, the GAF scale is used by psychiatrists and other mental health providers to provide a "shorthand" report of the client's psychological symptoms or her social/occupational functioning. The scale is divided into 10-point ranges, with a score of 91 to 100 reflecting "superior functioning in a wide range of activities" and no psychological symptoms. At the other end of the scale, a score of 1 to 10 reflects a "persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death." *See* DSM-IV. "A GAF score does not have a direct correlation to the severity requirements of the. . .mental disorder listings," even though a physician's GAF score is "fairly understood to convey" his belief regarding a patient's level of impairment or ability to function. Gilroy v. Astrue, No. 08-4908, 2009 U.S. App. LEXIS 24515, *2 (3d Cir. Nov. 9, 2009).

Contrary to Plaintiff's argument that a score of 52 reflects "serious" impairments, a score between 51 to 60, such as those reported for Ms. Quinn in both Dr. Marston's notes (Tr. 253) and those of her treating psychiatrist at Family Behavioral Resources between

18

March and August 2008 (Tr. 221, 225)[14] reflects "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV. In fact, on October 2, 2006, when Ms. Quinn first visited Family Behavioral Resources, her GAF was reported as 70, indicative of only "mild symptoms" or "some difficulty" in functioning, i.e., "generally functioning pretty well." (Tr. 222-224.) Ms. Quinn's GAF in an undated intake questionnaire from Kreinbrook Psychological Services (Tr. 235)[15] indicates a GAF of 65, also indicative of only mild symptoms. Thus, Plaintiff's GAF scores in the range of 52 to 70 are not indicative of serious symptoms and do not reflect an inability to perform any type of gainful employment.

While low GAF scores "are probative evidence that must be addressed by the ALJ," standing alone, such scores do not satisfy the claimant's burden to show she is disabled. Bonani v. Astrue, CA No. 10-0329, 2010 U.S. Dist. LEXIS 137871, *20 (W.D. Pa. Oct. 15, 2010). In sum, we conclude the ALJ did not err in his interpretation and application of Dr. Marston's report, including the GAF score

---

[14]    No GAF score was assigned when Plaintiff went to the emergency room experiencing depression, headaches and suicidal ideation in December 2007. (Tr. 187-206.)

[15]    This is the only GAF score the Court has been able to find in the records from Kreinbrook which extend over the period November 2008 through September 2009.  (Tr. 231-247; 285-292.)

19

which indicated only moderate psychological symptoms or moderate limitations in social or occupational functioning. Nor do we find any evidence that the ALJ was "picking and choosing" elements from Dr. Marston's report. That is, we find nothing in his report which supports Plaintiff's argument that she was precluded from all gainful activity. Plaintiff's motion for summary judgment based on this argument must be denied.

2. *The ALJ erred in his credibility analysis:* Plaintiff argues that the ALJ erred in his credibility analysis by mischaracterizing much of her testimony and relying only on her statements that supported his decision. In particular, he erred by finding she had only moderate restrictions in her activities of daily living while her testimony reflected problems with day-to-day activities such as personal care when she is severely depressed. Similarly, the ALJ found she had only moderate difficulties with concentration, persistence and pace, but she testified that when she is in a manic state, she cannot concentrate on any one task long enough to complete it. (Plf.'s Brief at 6-7.) Moreover, when concluding Ms. Quinn had only moderate difficulties in social functioning, he mentioned the fact that she could go shopping with her husband and take her son to medical appointments if she were accompanied by her mother-in-law, but failed to acknowledge that when she tried to go shopping alone, she experiences crying spells, feelings of paranoia,

and panic attacks. (Id. at 7.) Most importantly, Plaintiff argues, activities of daily living such as those mentioned by the ALJ are not equivalent to performing substantial gainful activity and statutory disability does not require a complete inability to perform such activities. (Plf.'s Brief at 7-8, *citing, inter alia*, Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001), and Rieder v. Apfel, 115 F. Supp.2d 496, 504-505 (M.D. Pa. 2000), for the proposition that "sporadic or transitory activity does not disprove disability" and may in fact "demonstrate not an ability but an inability to engage in substantial gainful activity.")

While we agree with Plaintiff's statement of the law regarding transitory activity, we are also mindful that in determining the claimant's credibility about the effect non-exertional symptoms have on her ability to do basic work activities, the ALJ must rely not just on her testimony but on the entire case record. *See* Social Security Ruling[16] 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements." Moreover, a reviewing court will "ordinarily defer to an ALJ's

---

[16] Social Security Rulings are agency rulings published "under the authority of the Commissioner of Social Security" and "are binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1); Sykes, 228 F.3d at 271. "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same. A ruling may be superseded, modified, or revoked by later legislation, regulations, court decisions or rulings." Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

21

credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor." Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). Where the ALJ has stated reasons which are consistent with the record for his credibility determination, this Court will not disturb that determination unless it is "patently wrong." Schmidt v. Barnhart, 395 F.3d 737, 746-747 (7th Cir. 2005).

Having reviewed the entire medical record, Plaintiff's own statements in her disability application and related documents, the transcript of her testimony, and the ALJ's decision, we conclude that Judge Pillion's credibility determination is "closely and affirmatively linked to substantial evidence and [is] not just a conclusion in the guise of findings." Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005). We therefore find no reason to disturb his analysis and Plaintiff's second argument for summary judgment must fail.

An appropriate order follows.

May ___ 17 , 2011          _William L. Standish_

William L. Standish
United States District Judge